ALEXANDER BLAIR V. STATE OF NEBRASKA.

FILED SEPTEMBER 22, 1904. No. 13,703.

Instructions to the jury must be based upon and applicable to the
evidence; and where in the trial of a criminal case an instruction
is given without any testimony to sustain it, and prejudice results
thereby, a new trial will be granted.

ERROR to the district court for Cedar county: GUY T.
GRAVES, JUDGE. *Reversed.*

*J. C. Engleman* and *W. E. Gantt,* for plaintiff in error.

*Frank N. Prout, Attorney General,* and *Norris Brown,*
contra.

BARNES, J.

At the November, 1903, term of the district court for
Cedar county, an information was filed against one
Alexander Blair, charging him with the crime of murder
in the first degree for the killing of one Cornelius Balliet.
To this information the accused entered a plea of not
guilty. He was thereupon tried, and found guilty of man-
slaughter. From a sentence of seven years in the state
penitentiary he brings error.

It appears from the evidence that on Saturday the 15th
day of August, 1903, Blair called at the home of Balliet
in Cedar county, and in the evening accompanied the
family to a neighbor's where they had a dance; that during
the day the deceased had been to Yankton, South Dakota,
accompanied by a step-son, and while on the way had
fallen out of the buggy, striking on his head; that there-
after he complained of being sick at the stomach and of
having pains in his head; that he partook very freely of
intoxicants during the day, and to use the words of the
witnesses, "Was as drunk as he could be and get around."
He went with the others to the dance, and there drank

considerable beer; it being shown that he, together with
the other persons present, drank four four-gallon kegs
of that beverage. When the beer was all consumed Balliet,
with his family, accompanied by Blair, returned home, it
then being about three o'clock on the morning of the 16th
instant. It clearly appears that the deceased was very much
intoxicated, and that when in that condition he was ex-
tremely abusive and quarrelsome. For some reason, not
disclosed by the record, on arriving at his home he became
very angry with, and abusive towards Blair; calling him
vile names and threatening him with violence. Thereupon
the accused, who had retired, got up, put on his clothing
and started to leave the house, when the deceased called
him back, and for a short time seemed to be in a better
humor. Blair then took off his shoes and was about to go
to bed again when Balliet repeated his abuse and threats
of violence. Blair again stated that he would go away, and
put on his shoes for that purpose, when the deceased viol-
ently assaulted him, striking him with such force as to
stagger him. The events which followed were detailed by
one Charles Frost, the only eye-witness to the whole trans-
action, in substance as follows:

"When we came back from Heitman's place Alex (mean-
ing the accused) went to bed with the boy, John Seiler.
I also went to bed, but Balliet was out in the yard cursing.
He cursed Alex and called him a s—— of a b——. Alex
said to me, what is that Mr. Balliet said about me? Oh,
nothing much said I; he says yes he did, I hear him and
I am going away, and he got up and went out of doors.
When he went out him and Balliet talked a few minutes
and they come back in as good friends as could be, and he
(meaning the defendant) sat down on the edge of the bed
and started to pull off his shoes; then Balliet came in and
went right by me and talked just as nice as anybody could
for a few minutes, and then he commenced cursing again.
Alex says, I am going if you are going to act that way. I
am going down to Lee's, and he pulled his shoes right
on again and started, and he almost got out when Balliet

called him back, and says: Come back here, there is no use of going off mad that way. And Alex turned and came back and sat down on the edge of the bed and commenced to take off his shoes again. At that Balliet commenced cursing him again, and he hauled off and struck Alex, and Alex struck him and he went about two-thirds of the way back down, and as he raised up he come back at Alex with all his force and struck him; Alex fell back and Balliet fell on his face and struck the floor, and hollered 'help me-Charlie'; he never knew anything more; Alex did not have any instrument, just his naked hands."

It also appears that before the assault Balliet had said there was going to be trouble, and he wanted the witness Frost to help him. John Seiler who saw part of the transaction, testified in substance as follows:

"I was in bed asleep, and when my step-father (meaning the deceased) hollered for help I woke up, and I seen my father going for the floor; Alex was trying to hit him, and my uncle Charlie Frost was holding him."

It further appears that the deceased fell on his face striking the edge of some boards that were in the corner of the room; that he lay there until he was picked up and carried out of doors; that Blair helped to carry him out and went for the doctor, and in other ways rendered what assistance he could. No evidence was introduced showing or tending to show any previous difficulty between the accused and Balliet. It was not shown that any ill-will existed between them, and it was impossible for the medical experts to say whether the injuries found on the person of the deceased were caused by a blow or by the fall described by the witnesses. On the facts, as shown by the evidence, epitomized above, the court gave the jury, among others, the following instruction:

"No. 18. The jury is instructed, that a party charged with an unlawful killing of a human being cannot avail himself of the claim of necessary self-defense, if the necessity for such defense was brought on by his own deliberate, wrongful act. Therefore, if the jury believe, from the

evidence, that the defendant sought, brought on or voluntarily entered into a difficulty with the deceased C. Balliet, for the purpose of wreaking vengence upon him, or for accomplishing some unlawful purpose, or if the jury should find and believe from the evidence beyond a reasonable doubt that defendant killed the deceased at the time when he had, because of the acts of the deceased, no reasonable apprehension of immediate and impending injury to himself, and did so to accomplish some unlawful purpose, or did it from a spirit of retaliation and revenge, then the defendant cannot avail himself of the law of self-defense."

The giving of this instruction is assigned as error. It clearly appears that the instruction is not supported by the evidence. There is nothing in the record which even remotely establishes or tends to establish a state of facts to which this instruction could apply. There was not a word of evidence introduced at the trial from which the jury might even infer that the accused had an unlawful purpose in view when he defended himself against the unprovoked attack of the deceased; or that in so doing he acted from a spirit of retaliation or revenge. It is a well settled rule that the instructions must be based on the evidence, and where an instruction has been given without any testimony to support it, and prejudice results thereby, it is reversible error. *Clark v. State,* 32 Neb. 246; *Curry v. State,* 4 Neb. 55; *Williams v. State,* 6 Neb. 334.

In *Walrath v. State,* 8 Neb. 80, it was said:

"Instructions to the jury must be based upon and be applicable to the evidence; and it is error to instruct the jury that they may find a material fact, of which there is no evidence from which it may be legally inferred."

This rule is approved in *Ballard v. State,* 19 Neb. 609, and *Morearty v. State,* 46 Neb. 652. By the instruction complained of the jury must have been led to believe that there was some evidence from which they might find that in repelling the assault made on him by Balliet, the defendant had in view an unlawful purpose, and acted in a spirit of hatred and revenge. Without doubt the jury must have

been prejudiced by this instruction, and the giving of it was reversible error.

The record contains many other assignments of error, some of which seen to require a reversal of the judgment, but it is unnecessary to consider them at this time. Neither is it proper or necessary to comment on the weight, character and effect of the evidence.

For the error committed by giving the instruction above quoted, the judgment of the district court is reversed and the cause is remanded for a new trial.

                                        REVERSED.